NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2015 VT 121

No. 2014-382

| | |
|---|---|
| Dow Tillson and Susan Tillson | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Windsor Unit, |
| | Civil Division |
| | |
| Richard A. Lane, M.D., and Lane Eye Associates | March Term, 2015 |

Mary Miles Teachout, J. (summary judgment); Theresa S. DiMauro (final judgment)

Michael J. Gannon and Sara M. Moran of Affolter Gannon, Essex Junction, for Plaintiffs-Apellants.

Keith Aten of Theriault & Joslin, P.C., Montpelier, for Defendants-Appellees.

PRESENT: Reiber, C.J., Dooley, Skoglund and Robinson, JJ., and Bent, Supr. J., Specially Assigned

¶ 1. **REIBER, C.J.** Plaintiffs appeal from a decision by the Superior Court, Windsor Unit, Civil Division, granting defendants' motion for summary judgment in a medical malpractice suit. We reverse and remand.

¶ 2. The record shows that plaintiff Dow Tillson underwent an elective procedure to remove a cataract in his left eye. Defendant Dr. Richard Lane, M.D., performed the procedure at Springfield Hospital. Plaintiffs alleged in their amended complaint that within twenty-four hours of surgery, Mr. Tillson's left eye showed signs of infection. Dr. Lane made a presumptive diagnosis of endopthalmitis, but did not refer Mr. Tillson to a retinologist for treatment. Within forty-eight hours of surgery, Mr. Tillson was permanently blind in his left eye. Plaintiffs attribute the cause of the endopthalmitis to Enterococcus faecalis, an infectious organism.

¶ 3.    According to the amended complaint, Dr. Lane and his co-defendant, Lane Eye Associates, breached their duty of care by failing to "adequately and timely recognize, diagnose, and treat the infection." Plaintiffs claimed that Mr. Tillson has incurred medical bills and that his blindness has resulted in pain and suffering as well as psychological stress, while Mrs. Tillson has suffered loss of consortium. Both plaintiffs claimed economic loss.

¶ 4.    During discovery, plaintiffs disclosed Dr. Jonathan Javitt, M.D., as their expert witness. Dr. Javitt earned his medical degree in 1982 from Cornell University Medical College and is a board certified ophthalmologist. Since 1987, he has been a member of the faculty of Johns Hopkins University School of Medicine and has served as an adjunct professor of ophthalmology. Dr. Javitt has authored multiple articles on endophthalmitis as well as cases on infections caused by Enterococcus faecalis. Plaintiffs expected Dr. Javitt to testify that, given the presumptive diagnosis of endophthalmitis, Mr. Tillson should have received a more proactive and aggressive treatment than what Dr. Lane provided. Plaintiffs indicated in their answer to defendant's interrogatory that Dr. Javitt's expert opinion was that Dr. Lane should have consulted with a retinologist regarding the necessity for Mr. Tillson to undergo an immediate pars plana vitrectomy.

¶ 5.    Defendants deposed Dr. Javitt in December 2013. At the deposition, counsel for defendants questioned Dr. Javitt regarding his qualifications and his opinion regarding the likelihood that Mr. Tillson would have retained his vision. Dr. Javitt stated that he is a board certified ophthalmologist and is regarded as a national expert in that field. He admitted that he is not qualified to perform vitrectomy surgery, but asserted that a retinal specialist would be qualified. Dr. Javitt later stated that he would not try to treat a case of endopthalmitis without consulting a specialist. Dr. Javitt said, if Mr. Tillson had undergone a vitrectomy and received antibiotics, "[h]e would have had a real chance versus no real chance of saving the sight in that eye." In response to a clarifying question from plaintiff's counsel, Dr. Javitt later stated, "I think more likely than not [Mr. Tillson] would have wound up with a better result."

2

¶ 6. Defendants moved for summary judgment on April 8, 2014. The superior court issued a decision granting the motion on September 8, 2014. The court based its decision on its determination that Dr. Javitt's testimony amounted to "loss-of-chance" evidence insufficient to prove that plaintiffs' injury was caused by defendants' departure from the standard of care. See also 12 V.S.A. § 1908 (setting forth plaintiff's burden of proof in medical malpractice suit). Plaintiffs appealed.

¶ 7. We review a grant of summary judgment de novo, using the same standard as the superior court. Smith v. Parrott, 2003 VT 64, ¶ 6, 175 Vt. 375, 833 A.2d 843. The moving party must demonstrate that there are no genuine issues of material fact and the party is entitled to judgment as a matter of law. Id. We resolve all reasonable doubts in favor of the party opposing summary judgment. Id.; see also Collins v. Thomas, 2007 VT 92, ¶ 6, 182 Vt. 250, 938 A.2d 1208 ("We review an award of summary judgment de novo, construing all doubts and inferences in favor of the nonmoving party.").

¶ 8. Plaintiffs argue that the trial court erred in concluding that Dr. Javitt's testimony was "loss-of-chance" evidence that did not meet the statutory requirement for proximate cause. " '[U]nder the [loss-of-chance] doctrine, the plaintiff would be compensated for the extent to which the defendant's negligence reduced the victim's likelihood of achieving a better outcome, notwithstanding the fact that the likelihood may have been reduced by less than fifty-one percent.' " Smith, 2003 VT 64, ¶ 7 (quoting J. King, "Reduction of Likelihood" Reformulation and Other Retrofitting of the Loss-of-a-Chance Doctrine, 28 U. Mem. L. Rev. 491, 493 (1998)). Underpinning this doctrine is the principle that "the loss of a chance of achieving a favorable outcome or of avoiding an adverse consequence should be compensable and should be valued appropriately, rather than treated as an all-or-nothing proposition." J. King, Causation, Valuation, and Chance in Personal Injury Torts Involving Preexisting Conditions and Future Consequences, 90 Yale L.J. 1353, 1354 (1981).

3

¶ 9.    Despite the loss-of-chance doctrine gaining support in other jurisdictions, we previously determined in Smith v. Parrott that the doctrine is unavailable in Vermont.  Smith, 2003 VT 64.  The plaintiff patient in Smith consulted the defendant, a family practitioner, regarding the loss of motor control in the patient's foot.  The family practitioner described the patient's condition as foot drop, a neurological condition in which the motor functions of the foot and lower leg are diminished and terminated.  The family practitioner referred the patient to a neurosurgeon.   When the patient consulted with the neurosurgeon eleven days later, the neurosurgeon concluded that no possibility of any functional recovery existed.  The patient claimed that the family practitioner's failure to arrange for an immediate neurological examination caused the patient's condition to deteriorate to the point of permanence.  The patient relied upon statements from an expert witness who testified at deposition that an earlier consultation with a neurosurgeon might have yielded a "fifty-fifty chance of some recovery."  Id.

¶ 6.   The expert later revised his opinion downwards, so that his estimation of the patient's chances of recovery was actually less than fifty percent.  Both of the experts' opinions regarding a less-than-fifty-percent chance of recovery supported a theory of the case that relied squarely upon the loss-of-chance doctrine.

¶ 10.    We recognized in Smith that the loss-of-chance doctrine is "fundamentally at odds with the settled common law standard . . . for establishing a causal link between the plaintiff's injury and the defendant's tortious conduct."  Id. ¶ 12 (citing 12 V.S.A. § 1908(3)).  We also discussed 12 V.S.A. § 1908, which provides that in bringing a malpractice case against a medical professional,

> [T]he plaintiff shall have the burden of proving:
>
> (1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by a reasonably skillful, careful, and prudent health care professional engaged in a similar practice under the same or similar circumstances whether or not within the state of Vermont.

4

(2) That the defendant either lacked this degree of knowledge or skill or failed to exercise this degree of care; and

(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.

12 V.S.A. § 1908 (emphasis added). Section 1908 "essentially codifies the common law elements of a medical malpractice action," which "have traditionally included a requirement that the plaintiff adduce evidence of a reasonable probability or reasonable degree of medical certainty that the defendant's conduct caused the injury." Smith, 2003 VT 64, ¶ 11 (quotations omitted). We declined to depart from these "strict statutory requirements," id. ¶ 13, concluding that "the decision to expand the definition of causation and thus the potential liability of the medical profession in Vermont 'involves significant and far-reaching policy concerns' more properly left to the Legislature." Id. ¶ 14 (quoting Crosby v. United States, 48 F.Supp. 2d 924, 931 (D. Alaska 1999)).

¶ 11. Plaintiffs' claim against defendant is similar to the claim in Smith, but unlike the expert in Smith, Dr. Javitt ultimately testified that "more likely than not [Mr. Tillson] would have wound up with a better result" if he received a "timely consultation" with a specialist.

¶ 12. The superior court believed Dr. Javitt's testimony lacked specific information about the result of the negligence. However, Dr. Javitt's stated opinion was that a vitrectomy would have resulted in "[s]omething that was substantially better than [Mr. Tillson] ended up with." Dr. Javitt called it "functional vision" in his left eye if Mr. Tillson had been treated with a vitrectomy and antibiotics. Dr. Javitt defined "functional vision" as vision that would have enabled Mr. Tillson to read large print.

¶ 13. We acknowledge that a portion of Dr. Javitt's testimony regarding the degree of vision that Mr. Tillson would have retained is equivocal. Nevertheless, "[b]ecause of its severe consequences, summary judgment should be granted cautiously so that no one will be improperly deprived of a trial of disputed factual issues." Provost v. Fletcher Allen Health Care, Inc., 2005

5

VT 115, ¶ 17, 179 Vt. 545, 890 A.2d 97 (mem.) (quotation omitted). "Summary judgment is improper where the evidence is subject to conflicting interpretations." Id. ¶ 15; see also PH West Dover Prop., LLC, v. Lalancette Engineers, 2015 VT 48, ¶ 31, ___ Vt. ___, ___ A.3d ___ (Dooley, J., dissenting) ("[If] reasonable people might disagree as to [the evidence's] significance, summary judgment is improper." (quotation omitted)). Reading Dr. Javitt's deposition testimony in its entirety, Dr. Javitt rendered the expert opinion that there was at least a fifty-one percent chance that Mr. Tillson would have had some meaningful degree of vision in his left eye if he had received a timely referral to a retinologist. Although conflicting evidence exists, this is not a Smith opinion.

¶ 14.   Dr. Javitt's statements at deposition indicate his opinion that Mr. Tillson's total loss of vision in his left eye would not have occurred if timely referral had been made to a retinologist. The testimony "articulates a theory of the case sufficient to withstand summary judgment." Provost, 2005 VT 115 ¶ 9. This theory is that a reasonably skillful ophthalmologist would have referred Mr. Tillson to a retinologist, and Dr. Lane's failure to do so caused the vision loss in Mr. Tillson's left eye. In other words, a factual assertion exists in the case that but for Dr. Lane's departure from the standard of care exercised by a reasonably skillful ophtalmologist, Mr. Tillson would not have suffered an injury. Cf. Wilkins v. Lamoille Cnty. Mental Health Servs., Inc., 2005 VT 121, ¶¶ 13-14, 179 Vt. 107, 889 Vt. 245 (discussing requirement for "but-for" causation in medical malpractice claims). Thus, Dr. Javitt's deposition testimony is sufficient evidence to withstand a motion for summary judgment.

Reversed and remanded.

FOR THE COURT:

_____

Chief Justice

6